Daniel, J.
In the ninth article of Judge Story’s work on Bailment, is to be found the most concise and lucid exposition of the rights, duties and obligations of carriers of passengers, that I have met with. It is there stated, that carriers of passengers merely for hire, are subject to the same responsibility as carriers of goods for hire, at the common law, so far as respects the baggage of the passengers: But as to the persons of the passengers, a different rule prevails. Attempts have been made to extend their responsibility as to the persons of passengers, to all losses and injuries, except those arising from the act of God or from the public enemies. But the support of this doctrine has been uniformly resisted by the courts, although a strict responsibility as to the carriage of the persons of passengers is imposed upon such carriers. Section 590. In section 592, the author proceeds to state as the result of the decided cases, that carriers of persons by stage coaches are bound to provide coaches reasonably strong and sufficient for the journey, with suitable harness, trappings and equipments; and to make a proper examination thereof previous to each journey. In other terms, that they *708 are bound to provide road-worthy vehicles suitable for the safe transportation of passengers: And if they in any of these particulars, and any damage or injury occur to the passengers, they will be responsible to the full extent thereof. Hence (he says) it has been held that if there is any defect in the original construction of the stage coach, as for example in an axletree, although the defect be out of sight, and not discoverable upon a mere ordinary examination, yet, if the defect might be discovered by a more minute examination, and any damage is occasioned to a passenger thereby, the coach proprietors are answerable therefor.
In the next place, they are bound to provide careful drivers, of reasonable skill and good habits, for the journey; and to employ horses which are steady and not vicious, or likely to endanger the safety of their passengers. Section 593.
In the next place, they are bound not to overload the coach either with passengers or with luggage ; and they are to take care that the weight is suitably adjusted, so that the coach is not top-heavy and made liable to overset. Section 594.
They are bound to make use of all the ordinary precautions for the safety of passengers on the road. The coachman must, in all cases, exercise a sound and reasonable discretion, in traveling on the road, to avoid dangers and difficulties. If he is guilty of rashness, negligence or misconduct, or if he shows any want of skill, the proprietors will be responsible for any injury resulting from his acts. Section 598.
The liabilities of such carriers naturally flow from their duties. As they are not, like common carriers of goods, insurers against all injuries, except by the act of God, or by public enemies, the enquiry is naturally presented, What is the nature and extent of their responsibility ? It is certain that their undertaking is *709 not an undertaking absolutely to convey safely. But although they do not warrant the safety of the passengers, at all events; yet their undertaking and liability go to the extent, that they and their agents possess1 competent skill, and that they will use all due care and diligence in the performance of their duty. But in what manner (the author asks) are we to measure this due care and diligence ? Is it ordinary care and diligence, which will make them liable only for ordinary neglect ? Or is it extraordinary care and diligence, which will render them liable for slight neglect ? As they undertake for the carriage of human beings, whose lives and limbs and health are of great importance as well to the public as to themselves, the ordinary principle in criminal cases, where persons are made liable for personal wrongs and injuries arising from slight neglect, would seem (he says) to furnish the true analogy and rule. It has been accordingly held that passenger carriers bind themselves to carry safely those whom they take into their coaches, as far as human care and foresight will go, that is, for the utmost care and diligence of very cautious persons, and of course they are responsible for any even the slightest neglect. Section 601.
In section 601 a, the further proposition is stated, that when injury or damage happens to the passengers by the breaking down or overturning of the coach, or by any other accident occurring on the ground, the presumption prima facie is, that it occurred by the negligence of the coachman; and the onus probandi is on the proprietors of the coach to establish that there has been no negligence whatsoever; and that the damage or injury has been occasioned by inevitable casualty, or by some cause which human care and foresight could not prevent. For the law will, in tenderness to human life and limbs, hold the proprietors liable for the slightest negligence, and will compel them to repel, by satisfactory proofs, every imputation thereof.
*710 This summary of the law seems to me to comprehend and to affirm all the propositions involved in the instructions given at the instance of the defendant in error.
The plaintiff in error, in his petition, denies the propriety of each of these instructions, but neither in the notes of his counsel accompanying the petition, nor in the argument here, has any serious effort been made to show by argument or authority, that the instructions have failed to propound the law correctly, except in two particulars. In order to determine whether the instructions have erred in either of these particulars, a more special notice of the law, in relation to them, would seem to be rendered proper.
In the first place it is urged, that carriers of persons are responsible for no more than ordinary neglect; and that as the instructions lay down a rule which imputes liability for a less degree of negligence than that which constitutes ordinary neglect, they have in such particular stated the law too strongly against the plaintiff in error. In support of this objection the authority mainly relied upon is the case of Boyce v. Anderson, 2 Peters’ R. 150. That case does, I think, decide the law as the counsel for the plaintiff states it; but in the case of Stokes v. Saltonstall, 13 Peters’ R. 181, it has been substantially, if not in terms, overruled.
Justice Barbour, in Stokes v. Saltonstall, in reviewing the decision in Boyce v. Anderson, says, “that was an action brought by the owner of slaves against the proprietors of a steamboat on the Mississippi, to recover damages for the loss of the slaves, alleged to have been caused by the negligence or mismanagement of the captain and commandant of the boat. The court distinguished slaves, being human beings, from goods; and held that the doctrine as to the liability of common carriers for mere goods, did not apply to them ; but that in respect to them, the carrier was responsible only for ordinary neglect. The court seem to have *711 considered that ease as being a sort of intermediate one between goods and passengers. We think, therefore, that anything said in that case in the reasoning of the court, must be confined in its application to that case; and does not affect the principle which we have before laid down.” And in a preceding portion of the opinion, the general principle is asserted, that though a carrier of passengers “ does not warrant the safety of the passengers, at all events, yet his undertaking and liability as to them goes to this extent: that he, or his agent, if, as in this case, he acts by agent, shall possess competent skill; and that as far as human care and foresight can go he will transport them safely;” and the case of Aston v. Heaven, 2 Esp. R. 533, is cited with approbation, in which it is held that whilst the action stands on the ground of negligence, yet the responsibility attaches to the smallest negligence.
And in Jackson v. Tollett, 3 Eng. C. L. R. 233, Lord Ellenborough states the law to be, that “ every person who contracts for the conveyance of others, is bound to use the utmost care and skill; and if through any erroneous judgment on his part any mischief is occasioned, he must answer for the consequences.”
The case of Crofts v. Waterhouse, 11 Eng. C. L. R. 119, is substantially to’the same effect. So in Hall v. Conn. River Steamboat Co. 13 Conn. R. 319, the court held that whilst the rule applicable to carriers of goods had not been applied in its fullest extent to carriers of persons, because they have not the same absolute control over passengers that they have over goods entrusted to their care; yet that both policy and the authority of adjudged cases require great care and skillful management in the transportation of passengers by common carriers. They said it was but right it should be so; that those, upon whose skill and careful management, not unfrequently, depend the lives and safety of others, should feel themselves responsible for any *712 want of care or faithfulness, and that they therefore fully approved the instruction given in the court below, that the defendants were bound to employ the highest degree of care that a reasonable man would use.
In Stockton v. Frey, 4 Grill. 406, and in Maury v. Talmadge, 2 McLean’s R. 157, and in Derwort v. Loomer, 21 Conn. R. 245, the same doctrine is maintained. And in the case of the Philadelphia and Reading R. R. Co. v. Derby, 14 How. S. C. R. 486, Justice Grier in delivering the opinion of the Supreme court uses the following strong and emphatic language: “ When carriers undertake to convey passengers by the powerful but dangerous agency of steam, public policy and safety require that they be held to the greatest possible care and diligence. And whether the consideration for such transportation be pecuniary or otherwise, the personal safety of the passengers should not be left to the sport of chance, or the negligence of careless agents. Any negligence in such case may well deserve the epithet of “■gross.” And in Angelí on the Law of Carriers, it is stated as the result of the decided cases, that “ the degree of responsibility to which carriers of persons are subject, is not ordinary care, which will make them liable only for ordinary neglect, but extraordinary care, which renders them liable for slight neglect. It is the danger to the public which may proceed even from slight faults, unskillfulness or negligence of passenger carriers or their servants, and the helpless state in which passengers, by their conveyances, are, which have induced the courts, both in England and in America, to bind the rule of the contract locatio operis, much tighter than could be insisted for on the ordinary principle of that contract. The most inconsiderable departure, therefore, from the important duties imposed upon passenger carriers, will render them liable for the consequences.” Indeed, I have seen no case except that of Boyce v. Anderson, which sanctions *713 the idea that the carrier is not responsible for slight neglect; and I feel no hesitation in approving the instructions of the judge in the particular under consideration.
The second error supposed to be committed by the judge below, in expounding the law to the jury, is to be found in the explanation accompanying the third instruction asked by the defendant in error. In the third instruction, it will have been seen, the judge instructed the jury that if they believed that the plaintiff was injured by the upsetting of the stage, and that the upsetting was caused by the horses running off; that the horses ran off, not because they.were accidentally frightened, but because the blocks were out of the brake, causing the stage to run upon them; and if the jury further believed that such running off of the horses might have'been prevented, if the horses had been properly harnessed, or if the utmost care and diligence.of a cautious person had been used, to secure the blocks in the brake; that the defendants were liable in damages. And the court accompanied this instruction by the remark to the jury, that in speaking oil the horses being “properly harnessed,” the court was not to be understood as expressing any opinion whether the horses should have had breeching or not; for upon that subject.he would express no opinion, leaving it entirely to the jury, as a question proper for their decision.
And the court afterwards, at the instance of the plaintiff' in error, instructed th.e jury, that in the absence of any express or special contract, the proprietors of stage coaches for the transportation of passengers, are not bound to guarantee as to, their coaches, harness and fixtures, m,ore than that they shall be sound and complete of the kind used upon their line, and offered to the patronage of travelers. And that they cannot be charged with damages resulting, with *714 out negligence, from the nonadoption of another kind or style of conveyance, harness or fixtures. The defendant in error having offered the testimony of witnesses to show, that, since the introduction of the brake, it was not safe to trust to that as a means of checking the velocity of stages in descending hills, with harness that had no breeching; and the plaintiff having offered evidence to show that when the brake was used the breeching to the harness was of no value as a means of safety; and that on his line, and on many other lines, the breeching had been abandoned as useless since the improvement of the brake had been introduced, it was, I think, evidently the purpose of the court, in the explanation given of the third instruction, to guard the jury against the impression, that in saying if the jury believed that the running off of the horses might have been prevented if the horses had been properly harnessed, &o., the plaintiffs in error were liable, the court intended to express the opinion that the failure to use breeching to the harness did of itself constitute neglect: whilst on the other hand the plaintiff in error was desirous of getting rid of the testimony offered by his adversary on that head by the instruction which he asked -, the effect of which was to negative the conclusion in law, of any neglect in failing to use the breeching, though the jury should be of opinion, from the evidence that harness with breeching would be safer than harness without, provided they should also believe that the harness used was sound and complete, of the kind used, upon the line of the plaintiffs in error.
It is insisted by the counsel of the plaintiff in error, that there is an obvious conflict between the third instruction of the defendant in error as explained by the court, and the first instruction given at the instance of the plaintiff in error; that the latter properly confined the jury to the enquiry whether the harness was sound *715 and complete of the kind used on the line, whilst the former left thre jury at liberty to impute neglect to the plaintiff- in error in failing to use harness of a different kind.
The discrepancy between the two. instructions complained of does, I think, exist; and it becomes necessary to enquire which of the two instructions is right. The question as to the liability of the carrier is presented in a peculiar and novel aspeet; but it will on examination, I think, be found to fall within the influence of well settled and familiar principles.
I have already cited the authority of Judge Story to show that the carrier is bound to provide coaches reasonably strong and sufficient for the - journey, with suitable harness, trappings and equipments. And there are numerous cases stating the law the same way; and among others, Christie v. Griggs, 2 Camp. R. 79; Bremner v. Williams, 11 Eng. C. L. R. 437; Crofts v. Waterhouse, Ib. 119; Sharp v. Grey, 23 Eng. C. L. R. 331; Stockton v. Frey, 4 Grill’s R. 406.
In the ease of Ingalls v. Bills, 9 Metc. R. 1, the correctness of some of these decisions, so far as they go to declare the stage owner to be a warrantor of the soundness and sufficiency of the coach in all respects, is denied. And it was there held that when the accident arises from a hidden and internal defect which a careful and thorough examination would not disclose, and which could not be guarded against by the exercise .of a sound judgment and the most vigilant oversight, then the proprietor is not liable for the injury; but the misfortune must be borne by the sufferer. Yet the court at the same time said, that the carriers of passengers are bound to use the utmost care and diligence in the providing of safe, sufficient and suitable coaches, harness, horses and coachmen, in order to prevent those injuries which human care and foresight can guard against; and that if an accident happens *716 from a defect in the coach, which might have been discovered and remedied upon the most careful and thorough examination of the coach, such accident must be ascribed to negligence, for which the owner is liable in case of injury to a passenger happening by reason of such accident.
If this case is to be regarded as establishing that a latent defect in the coach, which a careful examination would not disclose, forms an exception to the general undertaking of the carrier to furnish a sufficient coach, (about which I do not deem it necessary to express an opinion,)-it is clear, I think, that this exception has no bearing on the case, and that in expounding the law, there was nothing making it incumbent on the judge to state it. And the true point of enquiry out of which the conflict of instructions arose, was whether an alleged defect in the harness used by the plaintiff in error, (which if it existed, was a patent defect consisting in the absence of a certain portion of the harness, with or without which it could be used,) was a proper matter of enquiry for the jury; and if so, whether on their being of opinion that there was such defect, they could make it the ground for finding the plaintiff in error guilty of neglect.
If the proposition contended for by the plaintiff in error is to be received as the law, viz : that he undertakes only that his coaches, harness and fixtures shall be sound and complete of the kind used on his line, it follows that he may be excused from liability in the face of the amplest proof to show that owing to their style or kind, they were positively dangerous. In no case that I have seen can any warrant be found for such a rule. Could it be said, in the language of the case of Ingalls v. Bills, that á carrier uses the utmost care and diligence in the providing of safe, sufficient and suitable coaches, harness, &c. if it was shown that from want of care, skill or judgment, he *717 had selected for use on his line, a style of harness shown to be less safe than another which had long been in use, and which was known by him to be in use ? Such a rule seems to me to alter the relative rights and duties of the carrier and passenger. The passenger, instead of relying on the carrier to use the proper care and judgment in the selection of the coach, harness, &c. with a view to its safety, would have to use the utmost diligence, whenever about to take passage, in enquiring into the style and fashion of the coach used on the line, and then to determine for himself whether or not a stage constructed after such style or fashion, would or would not, probably, be safe. The law, I think, imposes no such duty on the passenger. He has, I think, a right to expect that the carrier who has undertaken to use the greatest eare and skill in providing for his safe passage, will exercise the proper caution and care in seeing that his coach is not only sound and complete of its kind, but is also of a safe kind. The traveling public have a right to expect that he who undertakes to fill such a responsible post, will bring to the discharge of its duties all the knowledge that appertains to the calling ; that he will observe and compare the different kinds of coaches in use, and direct his attention to the principles on which they are constructed, in order to use a well informed experience and an enlightened judgment in the selection of such as will be most likely to insure the safety of those who are to be carried in them. The carrier cannot be said to have fulfilled the requirements of the law so long as there exists any known want of safety in his coaches, harness, &c. whether arising from defectiveness of material or workmanship, or faultiness of the principle on which they are constructed, for which there is a known remedy, used wisely as a means of safety, by others, of skill and sound judgment, engaged in the same *718 business. A danger arising from any such defect cannot be properly regarded as one of those risks or dangers necessarily incident to the mode of travel, which it is presumed every passenger has made up his mind to encounter.
In the case before us there was not only testimony tending to show that there would be a greater degree of safety in using harness with breeching than without, but that the horses could be readily traiued to the use of such harness in holding back. In this state of things, seeing that the slight change in the harness, by the addition of breeching, would be attended by little or no expense and with slight trouble or inconvenience in training the horses to the use of it, it seems to me that it was a fair subject for the jury to consider (in case they believed what the evidence of the defendant in error tended to prove,) whether the failure of the plaintiff in error to make the change, as a measure of safety, was not evidence of a want of proper care and vigilance on his part, in providing for the safety of those traveling in his coaches.
The seeming conflict in the instructions was brought about by the plaintiff in error, in asking and obtaining from the court an instruction to which, in the view I have taken, he was not entitled; and there is nothing, therefore, in that particular, of which he has any right to complain.
Upon a view of all the instructions given by the court, as a whole, I have been unable to discover that they assert any principle which bears too harshly on the plaintiff in error, or which was calculated to mislead the jury, to his prejudice. And at a period when the facilities for travel are so rapidly multiplying, and the amount of travel is so constantly on the increase, I feel no disposition to relax any of the rules which hold the carrier to a strict accountability. When so many causes are conspiring to engender and foster a *719 love for the excitement of rapid traveling, which is daily betraying the managers and conductors of every species of conveyance into a fatal disregard of all the precautions essential to the preservation of the limbs and lives of those committed to their charge, I do not think that the law should slacken the reins by which to some extent at least, it holds them in check. On the contrary, policy, humanity and reason all seem to require from the courts a stern adherence to the principles which tend to insure the greatest care on the part of the carrier, and the least danger to the passenger.
The fourth instruction given at the instance of the defendant in error is objected to, not because it states the law incorrectly, but because, as is said, there was no evidence tending to prove that the coach was upset in consequence of having too much baggage on the top. If there was no evidence on that head, the plaintiff in error could not have been injured by a correct statement of the law, that the carrier would be liable for an injury arising from an overturning of the coach occasioned by its being too heavily loaded on the top. On the other hand, if there was any competent and relevant testimony, however slight, tending to show that the upsetting was due to that cause, the defendant in error was entitled to have the law in that particular hypothetically expounded to the jury. There was, I think, evidence tending to the proof of such, fact. Discarding the statement of the witness Cralle, that the driver Carper said to him that he thought there wTas too much baggage on the top, and that he thought the upsetting was in part occasioned thereby, as illegal, except for the purpose of impeaching Carper, I think there was circumstantial evidence, though slight, tending to the conclusion that the coach was top-heavy, and that the upsetting may have been partly due to that cause. It is in proof that *720 there were eleven passengers, nine inside and two on the outside. How and where their baggage was disposed, does not appear, with the exception that one of the passengers proved that his trunk was in the boot behind.
Carper says that he has no recollection as to the amount of baggage on the top of the stage, or the number or size of the trunks; that “ he found it all on, and under the canvas when he took charge; and had no occasion to handle or examine it.” And he further states “that in coming down the hill and around the turns, the stage rocked very much from side to side, and just before turning ovér on the left hand, had strongly tilted to the right, and in falling back, tilted the other way, and seemed to him to be some distance on the left wheels before it went clear over.”
And it is further shown that at the point where the coach overturned, the road was level across, though slightly descending. The rocking of the coach from side to side, and the manner of its turning over, were circumstances tending to the inference that it was top-heavy. I think the plaintiff in error had a right to the instructions.
The last cause of error assigned is the refusal of the court to set aside the verdict and grant a new trial. We have no certificate of the facts; but only a certificate of the evidence. When such is the case, this court has uniformly refused to take cognizance of the exception, except when it appears that after rejecting all the parol evidence in favor of the party excepting, and giving full force and credit to that of the adverse party,- the decision of the court below still appears to be wrong. Pasley v. English, 5 Gratt. 141; Rohr v. Davis, 9 Leigh 30. Applying this rule there is nothing to rebut or weaken the ¡grima facie case made by proof of the upsetting of the stage, and the conse *721 quent injury to the defendant in error. So far from it, the evidence in favor of the verdict shows most clearly a case of culpable negligence on the part of the driver. Without adverting to the other evidence in support of such a conclusion, the driver’s own account of his conduct proves it. He showed a want of ordinary care in failing to make a more minute examination of the blocks at Bed Banks where he first took charge of the coach. There was the same want of care in their examination at Woodstock, when the most ample time and opportunity were afforded for a thorough examination. Having failed to make such examination at Woodstock, he was guilty of the grossest negligence in failing to assure himself that the blocks were in before he commenced descending the hill where the disaster occurred. In the absence of breeching or any other substitute by which the horses could hold back and prevent the stage from running on them, he knew that his main if not sole reliance for a safe descent of the hill was in the brake, which, he also knew, would be of no avail, if the blocks were not in place; yet he most negligently and recklessly commenced the descent of the hill without having tested the presence or absence of the blocks, which might have been done by simply applying his foot to the brake. Whilst descending the hill he for the first time discovered that the blocks were out. The brake of course was useless. As might have been expected, the stage soon began to run on the horses, and they, in the absence of any other cause of fright, ran off and upset the stage. The disaster is thus most clearly traced, by the driver’s own account of his conduct, to his unpardonable failure to provide the means, within his power, by which to prevent it.
It is, however, in the last place insisted that the damages are excessive, and that this appears from the *722 evidence of the defendant in error, and that the court ought to have granted a new trial for that cause.
There is no rule of law fixing the measure of damages in such a case; and it cannot be reached by any process of computation. In cases of the kind, the judgment of the jury must govern, unless the damages are so excessive as to warrant the belief that the jury must have been influenced by partiality or prejudice, or have been misled by some mistaken view of the merits of the case. 16 Pick. R. 547.
On the one hand, the damages seem to be heavy. On the other, the injuries, losses and sufferings which they are designed to compensate, are proved to be great.
The head of the defendant in error was severely cut, and one of his legs badly broken, the smaller bone protruding through his clothing and boot. One of his physicians thought, at first, that amputation would have to be resorted to. His agonies, physical and mental, must have been intense. For some time his mind was seriously affected. At the time of the trial, rather more than a year after the happening of the disaster, his leg had not entirely healed; the limb was shortened and the joint stiff. The use of crutches was still necessary, and the physicians expressed the opinion that he would be a cripple for life. He was necessarily confined for some six months in a house near the place of the disaster, detained from his business, and from his home, which was in another state. The presence of members of his family, some during the whole time, and others for a portion of it, was necessary, in order that his wants and comforts might be properly attended to; and the expenses which he encountered in the discharge of the bills for boarding and the attendance of his physicians, and other incidental charges, were necessarily large.
*723 In view of such a state of facts, I cannot undertake to say that the damages are so plainly beyond a reasonable compensation, so manifestly exorbitant, as to require us to disturb the estimate and verdict of the julT-
I think the judgment ought to be affirmed.
The other judges concurred in the opinion of Daniel, J.
Judgment affirmed.